And we'll turn to the second case on our calendar, Harry T. Anderson v. Eastern CT Health Network. Harry T. Anderson All right, we'll hear from a panelist counsel, Ms. Leo Hart. Good morning, your honors. Thank you for the opportunity to present argument to you today. My client, Dr. Harry Anderson, took a medical leave of absence at the request of his employer, the defendants, to get evaluated because he had been presenting behavioral and appearance concerns. There were no concerns of current or prior issues involving patient harm, and I commend the court to the record at AP00272-74. As part of what was called a collegial process under the physician health program that the hospital had established in accordance with joint commission requirements, Dr. Anderson went to a Haven program, which is described in my briefs, got evaluated. He was cleared by at least six physicians, experts who evaluated him from head to toe, and the problems that he had displayed were attributed to side effects from an antidepressant medication that he had been taking. He had been taken off the medication, and the problems were resolved. Under the bylaws, the collegial process and the diversion over to the Haven program was in lieu of disciplinary action. The only additional evaluation to be done at the time that Dr. Anderson sought to return to work was presented by Haven to the defendants, and it was a 30-day surgical skill review. This was the last stage in an individualized assessment that was recommended only as a prudent measure, not required by any findings, but presented as a prudent measure based on recommendations that Haven's medical review committee had received from the American College of Surgeons. When this proposed final stage of the individualized assessment was presented to the defendants, they shut down the process, and they went back to work. And instead of engaging in an interactive process about that request, they voted to impose disciplinary action, and that you will find, your honors, at the record. The problem is here, the disciplinary action is monitoring, correct? Is that what you're talking about? No, your honors, the disciplinary action was... Is this an earlier point? I'm talking about a stage before the monitoring. The disciplinary action... It was the June plan and the May plan that were advanced, right? Isn't that what this case is really about? Well, your honor, we have to respect the case is about two things. The defendant's failure to allow for that final stage of the individualized assessment, upon which information would have been gleaned, that painstaking inquiry that would have informed the defendants with regard to how to craft a reasonable plan for return to work, and it was that aspect of the process that was the most important. But your client agreed in substance with the plan. He did not agree to have indefinite monitoring. He agreed he wanted to have finite periods of monitoring. But other than that, it seems to me that the parties were pretty much in accord. Is that a mistake? I believe that the district court, your honor, found facts indicating that was the case, but that is belied by the facts in the record. There are many facts in the record that indicate several things. One, Dr. Anderson objected to the structure of the plan proposed by the defendant. What does that mean, the structure? Does that mean that the defendant, that he waived any and all rights to ever challenge the indefinite process? To follow up on just Walker's question, at a certain point, and maybe we're just getting ahead, was it not the case that Mr. Anderson's only real objection was the number of days, the length of the reporting period? Is that correct? Your honor, it's partially correct. Dr. Anderson's objections were as follows, that once the parties got to the point of agreeing about doctors who would be available as proctors, then the final June 22nd proposal, which was negotiated, was involved from his side of the equation, a request that he would pass the first phase as an assistant, and the second phase as an assistant. And the second 30 days with a surgeon available reviewing his skills. And upon successful completion of that phase, a recommendation would be made that he could go back to practicing surgery without the proctor. And as Haven indicated, the Haven monitoring program would be in place, and the skills would be reviewed on an annual basis only. Unlike that proposal, the defendants proposed that the proctoring go for an unlimited point of time. And what's most critical here that the district court did not adequately consider, your honor, is the fact that there is conclusive evidence in the record that the defendants themselves agreed and found that that unlimited proctoring period of time and the waiver was not reasonable. And let me please explain for a moment what I mean there. If a doctor was to put a time limit on the proctoring, if he successfully passed his skills review, he had no choice but to take an appeal. And that's because the May 4th letter actually constituted adverse professional action, and there's a whole process in the bylaws that requires a doctor to either appeal or forever waive the right to appeal any components of a plan there. So he did take the appeal, we continued to try to negotiate something, but ultimately he took an appeal. And the appeal was an opportunity that he took to present all pertinent facts before an ad hoc committee that was comprised by the medical staff, the medical executive committee. And ultimately that committee heard all the facts, all the anecdotal evidence that the defendants wanted to put in. They heard live testimony, there was extensive testimony from Dr. Anderson, all his peer review records showing he was compliant with the standard of care. So that's just, there's one other question. Ultimately the ad hoc committee came up with a plan that your client could agree with, correct? Yes, the ad hoc committee's plan agreed with Dr. Anderson's. What are the damages here? Ultimately he could go back, he could practice, there's a plan that's acceptable, it took some time to work out. But what's your claim here, given the fact that parties are ultimately in agreement? Our claim is that ultimately the ad hoc committee agreed with Dr. Anderson, medical executive committee agreed, and the board of trustees agreed. And as a result he was delayed for 18 months, 18 months from returning to the office practice or returning into the... But he was still subject to monitoring during that period, correct? No, you're right. I mean under his plan, the monitoring was a feature of all of his plans, wasn't it? Well, the monitoring was in place and Dr. Anderson successfully completed the monitoring after five years. But he was not permitted to practice at the hospital. He was terminated by the employer. Since the damage is following his termination until the acceptance of the plan, is that the... requirement, once his privileges were restricted and reduced, his job could immediately be terminated. And in fact, it was terminated while the defendants council was negotiating with Haven, with defendants, with Dr. Anderson. But this was a period in which his abilities were not ascertained, his impairments were not... They needed to be reassured. So I'm just trying to figure out exactly at what point in time he was able to return to the office. At what point the decision was such by the hospital that he should have been immediately back to work full time on everything, without any monitoring, without any restrictions, and then presumably damages would accrue from that point on to the... his agreement ultimately to the ad hoc committee's plan. I'm fuzzy on what the damages are here, given the fact that he ultimately agreed. I know it's a little bit outside the case, you haven't gotten the damages here, but I'm trying to understand what the suit's about. What the suit's about is that Dr. Anderson was terminated by his job during a period of time when the hospital should have reported him an individualized assessment of his skills. There was no evidence before the medical executive committee that suggested he could not practice safely. All the medical doctors had cleared him. The only reason that Haven proposed an individualized assessment of surgical skills was because they thought it would be a prudent measure, something that's done with a new surgeon or a surgeon who's been out for a while. Other than that, he was cleared. I believe that that was among the duties in his employment contract, but in terms of accommodating Dr. Anderson to go back to work, it would not have been uncommon for an employer to relieve an employee of their duties to allow for a transition. It can rightly be regarded as an essential function, certainly from the perspective of the employer. It was not described as an essential function. It was one of his functions. I think the more essential function was that he would perform surgery. In your brief, did you challenge that or dispute that? It wasn't raised as an issue upon which the district court issued its ruling on, Your Honor. However, there are material facts in dispute about what the essential functions of the job were, and that should have been left for a jury to determine. But again, it wasn't part of the district court's determination. This is a hospital and taking steps to maximize or minimize with the risk to patients. Who are subject to surgery by Dr. Anderson. And, you know, there were incidents which called into question his ability to perform surgeries properly. And we don't need to get into those here, but there were a series of incidents that occurred. And then there was the evaluation done. And the last such incident was in early January of 2011. And by June, the problem had been worked through. Yes, he'd been terminated, but there had been, there was the monitoring, the Havens report, and all of this. And it seems to me that just taking a general view of what the hospital did here was that they weren't trying to destroy his career at all. They were trying to figure out ways to get him back to work in a way that could satisfy their concerns for public safety. Well, Your Honor, I respectfully disagree with you. The hospital had before, had an opportunity to conduct a reasonable investigation into the issues. When Dr. Reich and Dr. DiStefano, the chief of staff, was interviewed by, during the ad hoc hearing process and throughout the process, both of those doctors, who were the overseeing physicians, if you will, responsible for making sure that Dr. Anderson was safe, insisted that the chief of staff, Dr. Anderson, insisted that there were no patient safety concerns current or prior. And in fact, they conveyed that to the Haven program, which is a specially established program to deal with issues like this, and Dr. Anderson wouldn't have qualified to participate in that program if there were patient safety issues. The facts at page four of the district court's decision, which relates to anecdotal information, were directly rebutted and overcome and irrefutably rebutted during the ad hoc committee hearings. And that's why the ad hoc committee agreed with Dr. Anderson and ultimately, the MEC deemed it reasonable to adopt the recommendations of the ad hoc committee. So it's your position that the findings by the district court here were erroneous? Yes, and they were erroneous on several fronts. The facts are in dispute and in issue, and the district court at page four adopted facts that were a rendition of the defendant's facts based on anecdotes only and were directly contradicted in the record throughout by direct, credible evidence presented by Dr. Anderson during the hearings and through evidence that was created by six evaluative medical experts. Now, I understand your Honor's concern about it being a hospital setting, and I fully appreciate that. I represent physicians all the time and help them navigate with various issues, as well as hospitals. However, in this instance, this is not a circumstance where we had a doctor who had a record of bad care, patient harm, or imminent danger. In fact, the bylaws before you that were in the record would require the hospital to summarily suspend Dr. Anderson's privileges if he posed this direct threat or if there was a possibility of imminent harm. It seems very deeply eccentric to accept the proposition that there was nothing in the record to support the interest of the hospital in taking this initiative. You're suggesting a level of bad faith on the part of the defendant, which is not based on anything in the record or of his actual performance. Is that right? Yes, it is, Your Honor. And I tell you that because when the leave of absence began, Dr. Anderson gave a set of authorizations to all of the doctors in the medical level. Okay. What is your theory for why the medical board or the hospital would have this bad faith animus toward your client? If it's not based on some record of concern, and there is some record of concern. Page 273 of the joint appendix, Dr. Rice testified, we were just very, very concerned that somebody might be harmed. There's also a January 2011 incident noted by the district court. I mean, what is the theory of why they would go after his ability to practice if it's not at least grounded on some perspective, some view of the actual performance? Well, Your Honor, for me to speculate to that invites an issue that I think a jury would be best to determine. However, I'll do my best to answer you. I think what happened... Even better, even better. I've given you lots of extra time, which I'm delighted to do. Don't get me wrong. But give us some thought to that question. And then when you come back up on rebuttal, which you'll have an opportunity to do, you'll be prepared to answer the question. Thank you, Your Honor. Thanks, Your Honor. I'm not trying to put you on the spot here. Fine. Thank you very much. All right, Ms. Garofalo. Good morning, Your Honor. Beverly Garofalo on behalf of the Appellee's ECHN, Inc., and its subsidiary, ECHN Health Services. This is a failure to accommodate claim arising out of Title I and Title III of the ADA in which the appellee did not meet the requirements of Title I. In this case, Dr. Harry Anderson, a surgeon, rejected an offer of reasonable accommodation for one reason, which was concern about potential reportability to the National Physician Database. The District Court's grant of summary judgment should be affirmed for two reasons. First, as a matter of law, the fact of potential reportability of the restriction does not render an otherwise reasonable accommodation unreasonable. Your advisory says there are actually a couple of other reasons. Well, I was going to emphasize the two and say that starting at page 42 of our brief, we had identified a number of other alternative reasons that we had raised below, and Judge Chotney seized upon this issue as a matter of law, looking at the tension between HCQA and the ADA that the plaintiff was bringing by virtue of the kind of growing evidence that was available. There was no evidence in the record that the reason he rejected it was concerns about reporting. And then also, there was no misapplication of the plainly reasonable standard. Judge Chotney's decision should be upheld because it properly held that the Americans with Disabilities Act cannot mandate a healthcare entity to artfully craft an accommodation to avoid reporting. What the court properly noted in this decision was, and what your honors have alluded to this morning, there was no objection on its own terms. Dr. Anderson didn't object on the substance of the proctoring arrangement, and indeed the proctoring arrangement was first identified by Haven. And although it was represented that it was for a finite 30-day period, and there was no basis for it, what Haven informed ECHN Medical Examining Committee was that due to testing results showing relative weakness in motor skills and inability to assess whether these could affect his surgical performance, therefore, Haven has recommended, and this is at 2037 in the joint appendix, Haven has recommended a proctor be retained at the expense of the physician to observe performance of surgical procedures in the hospital setting for not less than one month or until such time as the proctor recommends discontinuing observation. And he didn't quarrel with the Haven report. He did not, your honors. In essence. The only thing he was concerned about was the duration of the reporting requirement. Exactly. So what seemed to have happened was the MEC heard it, they convened, they looked at the pre-leave conduct, they looked at the results of the neurological test, the recommendations of Haven, who Dr. Anderson was under contract with, and offered that accommodation of proctoring. It did not have a finite end. Haven hadn't asked for that. It appears that what happens after that is they realize that, oh, wait a second, maybe this is going to require reporting because it seemed to be a quote-unquote restriction. So then they started coming up with different alternatives, but they all involved a proctor. And that includes the ad hoc committee's final modified plan. Correct, your honor. And he accepted that? In total? He did accept that in total. And the only difference was, was it a 30-day assist period followed by two 30-day periods of proctoring, ostensibly to avoid... So what happens after the acceptance of the ad hoc committee modified plan? Dr. Anderson did not thereafter submit a complete application for reinstatement for privileges. And on the record, is there a reason why? One of the things I know that was mentioned at oral, one of the two oral arguments that Judge Chodny held was that he didn't have malpractice insurance, that there could have been other reasons as well. But he did not. Well, this is, the following question is based on these procedures, so bear with me. Was there not something else that could be done for him in light of the inability to get malpractice insurance in the circumstances? Was there not some other way of... Let me back up a moment. You can understand, I think we can all understand his concerns about these reporting requirements, which are probably a de facto death sentence for a career, or at least very injurious to anyone's reputation as a doctor. So are there not other ways in which the concerns of the hospital for the safety of patients would have been fulfilled, accomplished, while yet giving him a medical livelihood, to put it simply? Well, Your Honor, I guess I would disagree with the characterization of it being a death now. A report is a fact. Dr. Anderson was subject to... What's the purpose of these reporting requirements? Specifically, so doctors can't go from state to state without knowledge of potential issues that could be reflecting on their competency, but there's also something called a revision to action. Dr. Anderson feels certain that he would have been able to demonstrate that he was competent within 30 days. Had he done so, there's the opportunity under HCQA to provide that additional information into the database. Of course, your response is you never got a chance because he didn't follow up. Your Honor, correct. He made the decision to object for the sole reason that he wanted to avoid the reporting requirements. And as Judge Chodny said... And why, in your view, did he want to avoid the reporting requirement? To go back to the effect of such a decision? I understand one of the things that the executive director of Haven had testified to, I believe at the ad hoc, was obviously no reported to the National Physician Database. That's clear. But there are important reasons that Judge Chodny cited after analyzing it, after analyzing HCQA, after discussing how important it is that healthcare entities are afforded immunity for such reports. They face potential sanctions if they don't properly report. So the notion that the ADA would ever require an employer to do, a healthcare entity to do a delicate end-run around it in order to comply with the ADA would undermine the interest. You also defend, as I understand it, on the ground that Dr. Anderson posed a direct threat. Is that correct? That is one of the arguments, that if he didn't have a proctor, that there would be a direct threat if he rejected that. And of course, this is on summary judgment. Correct. And do you agree that there was at least a difference of opinion among the employees at the hospital, for example, who were inclined to let him come back to work with some accommodation? So you could infer from that that he didn't pose a direct threat to patients. Is that correct? Correct, Your Honor. That was, again, one of the arguments, other arguments that we identified. So having said correct, would you retreat from that direct threat argument? No, I would not retreat from that. That if he didn't have the proctor, he would pose a direct threat. If he rejected that accommodation. So our point is everybody agreed, all the parties agreed on the accommodation. The only sticking point was the reportability of it. And as Judge Chotinay stated in the decision at page 19 in the special appendix was, in light of HICWA and its important purposes, I cannot endorse the suggestion that the ADA may require a health care entity to structure a modification so as to avoid MPDD reporting. Congress, after all, authored the ADA just as it authored HICWA. It cannot reasonably be supposed that these two statutes are in such tension that a hospital can obey one only by executing a delicate end run around the other. Now, there's also a Title III claim? Yes. Could you just briefly address that and what the difference is between a reasonable accommodation and a reasonable modification? There really aren't any, Your Honor, for present purposes. The plaintiff has alleged that these are integrated entities. The court didn't distinguish between one or the other. Title I was dealing with his employment. Title III was dealing with his holding of privileges at the hospital on the medical staff. Both statutes obligate employers to provide reasonable accommodations in order to allow them to perform their essential job functions or enjoy the accommodations. So the analysis is the same. Again, at the end of the brief, we identified as an alternative ground under Title III that there was absolutely no evidence of any type of discriminatory animus. Dr. Anderson was hired knowing that he suffered from depression. He had had a bout that had caused some problems before they hired him in August of 2010 and they absolutely accommodated him by allowing him to hold on to his privileges but under supervision with a proctor in the operating room. Thank you, Your Honor. All right. Closing counsel is reserved two minutes. Thank you, Your Honors. First, I'd like to say that the HICWA argument is entirely irrelevant, as I've indicated in my oral argument on summary judgment, and throughout their briefs have always maintained that the HICWA report was not due. So the district court's position that the HICWA report trumps the ADA here under these circumstances in this case is inappropriate. The defendants made an admission. It's an admission of a party. The HICWA reporting was ultimately a secondary issue. It was a secondary concern of Dr. Anderson, and since no report was due by virtue of the admission of the defendants for the court to have determined this case should be dismissed on summary judgment because the district court decided that a mandated report to the National Practitioner Data Bank was due was inappropriate. If there was a report due... I'm not sure that that's an accurate characterization of this court's decision, but go ahead. Well, I think that the court had to have found that a report was due, Your Honor, in order to go to the next stage, and I would say this to Your Honor. First, the ADA. The ADA comes into play when a qualified individual with a disability requests a reasonable accommodation in order to perform the essential functions of their job. It presents a facially reasonable accommodation. The defendants then have to respond with whether the accommodation allows for an efficient, effective return, and then they go through the undue burden analysis. There was no undue burden analysis on here or presented, mind you. But secondly, you don't even get to the question of is there a mandated report until you've gone through that very individualized analysis to determine the physical and mental condition of the party, and then to begin to craft what would be a reasonable accommodation. Thank you, counsel. We'll reserve the decision. Thank you very much.